THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BILLY L. SIMPSON, Defendant-Appellant.

First District (5th Division)   No. 1—93—0120

Opinion filed November 10, 1994.

MURRAY, P.J., dissenting.

Robert G. Grossman, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Annette Collins, Assistant State's Attorneys, of counsel), for the People.

JUSTICE COUSINS delivered the opinion of the court:

On August 27, 1991, the defendant, Billy L. Simpson, was charged with two statutory offenses: (1) theft (Ill. Rev. Stat. 1989, ch. 38, par. 16—1(a)(2) (now 720 ILCS 5/16—1(a)(2) (West 1992))), and financial exploitation of a disabled person (Ill. Rev. Stat. 1989, ch. 38, par. 16—1.3(a) (now 720 ILCS 5/16—1.3(a) (West 1992))). Following a bench trial, the defendant was found not guilty of theft and guilty of financial exploitation of a disabled person. The trial court sentenced the defendant to 30 months' probation and 100 hours of community service. On appeal, the defendant contends (1) the trial court erred in finding him guilty beyond a reasonable doubt of financial exploitation of a disabled person, and (2) the statute criminalizing the offense of financial exploitation of a disabled person is unconstitutionally vague.

We affirm.

## BACKGROUND

At trial, the victim, Alana Smith, testified in the State's case in chief. She testified that she was 41 years old and that her source of income consists of social security disability checks. She also testified that even though she graduated from Columbia College in Chicago with a degree in arts and entertainment management and once worked on and off as a substitute teacher, she is currently unemployed and suffers from a medical condition known as post-poliosclerosis.

The defendant had been Ms. Smith's insurance agent for five years. In early March 1991, she discussed possible investment and savings options with the defendant for $14,000 which she had recently received. On March 25, 1991, she withdrew that money, in the form of a cashier's check for $14,000, from her bank.

Two days later, she met with the defendant in her home. To that meeting, defendant had brought with him applications and enroll-

ment papers for Prudential Bache's (defendant's employer's) investment program. After discussing investment options with the defendant, she filled out one of the applications, intending to enroll in two separate programs whereby $5,000 would be invested in a high-yield program to mature in 120 days and $9,000 in another program. She signed over the cashier's check to the defendant in exchange for a promissory note signed by the defendant payable to her order for $5,000 that stated both the principal amount due and the interest due. No receipt, however, was given for the $9,000.

In late April 1991, Ms. Smith attempted to contact the defendant because she had not yet received any official documents for her investments. On May 5, 1991, the defendant assured her that the official documents were forthcoming and that there was nothing to worry about. Having not yet received the materials, she again attempted to contact the defendant in June 1991 regarding the same matter. In July 1991, when they discussed the matter, Ms. Smith inquired as to what had happened to the $9,000 investment and told the defendant that she was becoming concerned because she had not yet received any official documentation in connection with her investments. She also told him that she wanted to withdraw some money from her investment because she had some financial obligations to meet. After Ms. Smith expressed her concerns in this regard, the defendant told her that he would meet with her and bring her the money that she had requested.

On July 12, 1991, the defendant met with Ms. Smith. Although she was expecting to receive the money that she requested, the defendant gave her a Prudential "premium" check for $37 and some odd cents and $80 in cash from out of his pocket. Ms. Smith also had the defendant update the promissory note to reflect the total amount that he had received because she had still not received any official documents in connection with her investment of both the $5,000 and the $9,000.

Becoming very concerned, on that same day, Ms. Smith called Prudential's investigation department and spoke with Barbara Blakeslee. After the conversation, she wrote out a detailed report of everything that had transpired and called her bank, Northern Trust, to ask them to please send her a copy of the $14,000 cashier's check.

On July 15, 1991, the defendant again agreed to meet with Ms. Smith at some future date to return all of her money. He told her that he was applying for a personal loan at a bank in order to pay her back on her investment to Prudential. The defendant, however, never returned the $14,000 which she had entrusted him with, but rather Prudential later reimbursed her with her entire investment

in addition to whatever interest would have accrued. Ms. Smith testified that when she signed over the cashier's check to the defendant, she was under the impression that it was going to be invested in a Prudential Bache mutual bonds program and that the defendant never told her that it was a personal loan.

Barbara Blakeslee, an investigator in the business practice unit of Prudential Insurance Company in Chicago, testified that on July, 12, 1991, she received a telephone call from Ms. Smith, who expressed some concerns about her insurance agent, the defendant. She told Ms. Smith that, before she could proceed with an investigation, she needed a statement in writing. Miss Blakeslee received such a statement from Ms. Smith about a week later. After receiving the statement, she checked the company records and discovered that Ms. Smith had preexisting life insurance policies with the company but no recent policies or investments had been opened in her name.

On July 23, 1991, Miss Blakeslee and the district manager met with the defendant at the district office in Tinley Park, Illinois, and discussed Ms. Smith's complaint about him. At that meeting, Miss Blakeslee showed the defendant a copy of the check that was given to him by Ms. Smith. When told about the complaint, the defendant stated that he could not understand why Ms. Smith would have gone to the investigation unit to complain about him. When he was asked about the $14,000 investment that Ms. Smith claimed that she had made with him, he stated that it was a personal loan between himself and Ms. Smith and he could not understand why Ms. Smith would come to them about that. He explained that the check that was given to him by Ms. Smith had been endorsed by his wife, Kelly Simpson, and deposited into her account and was spent within 14 days. According to Miss Blakeslee, the defendant told her that no investment application forms had been filled out by Ms. Smith. After being asked by Miss Blakeslee, the defendant sent her a written statement telling her what he could recall about the entire situation.

Miss Blakeslee further testified that she had been employed for 15 years and that she had worked as a salesperson. She described the normal procedure as to what takes place when a client decides to invest in a municipal fund. The client fills out and signs an application form and gives a check made payable to Prudential to the agent. The check along with the application is given to the company and an account is established in the client's name which generates a confirmation statement and subsequent monthly statements are sent out to the client.

After the State presented its case in chief, the defense attorney made a motion for a directed finding. In arguing the motion, the

defense attorney maintained that the State had failed to demonstrate that Ms. Smith was a disabled person suffering from a permanent physical or mental impairment that rendered her incapable of avoiding or preventing the commission of the offense and, as a result, the State had not sustained its burden in proving that the defendant had violated the criminal statute which prohibits the financial exploitation of a disabled person. (Ill. Rev. Stat. 1989, ch. 38, par. 16—1.3(a) (now 720 ILCS 5/16—1.3(a) (West 1992)).) The trial court denied the motion.

The defendant then testified on his own behalf. He testified that he was 53 years of age and had never been arrested. In 1991, he worked as a sales representative for Prudential Insurance Company and had known Ms. Smith in that capacity for approximately five or six years.

In March 1991, while in Ms. Smith's home, they discussed investing a check for $14,000 which she had just received as part of a larger sum that she had previously received from her father's death so that by the time she reached age 55 she could draw a portion of such an investment as income. The defendant further testified that he thought that he had developed a "real good" personal relationship with Ms. Smith and, on that date, told her that he was having a financial situation and asked her to lend him some money. He proposed to borrow the money from Ms. Smith at a 16% or a 21% interest rate or a $2,100 return on Ms. Smith's loan over a short period of time or a year.

According to the defendant, Ms. Smith agreed and endorsed the $14,000 cashier's check over to him in exchange for a $5,000 promissory note signed in his own name. He left her home with the understanding that Ms. Smith was totally aware of what they had discussed and that they were totally in agreement on the matter. The defendant conceded that he never repaid the loan, though he intended to eventually repay it.

The defendant admitted that, on March 27, 1991, he did show Ms. Smith brochures and application forms for investing funds with Prudential, but that she did not fill one out. He also acknowledged that he spoke to Ms. Smith about short-term yield funds. He stated that even though the words "personal loan" did not appear on the note and the word "investment" did appear, the two dates on the note indicated that he was to pay one portion of the loan by a certain date and another portion by another date and that if Ms. Smith wanted to continue with the loan then he would be paying the agreed-upon interest. He also admitted that the initial promissory note, or receipt, was for $5,000 and the $9,000 amount was not added until July, 12, 1991.

Following closing arguments, the trial court found the defendant not guilty of theft and guilty of financial exploitation of a disabled person. The defendant was thereafter sentenced to 30 months' probation and 100 hours of community service. The defendant now appeals his conviction for the financial exploitation of a disabled person.

OPINION

I

Initially, the defendant contends that he was not proven guilty beyond a reasonable doubt of financial exploitation of a disabled person because the State never elicited any testimony demonstrating that Ms. Smith suffered from a permanent physical or mental disease which rendered her incapable of avoiding or preventing the defendant from committing the offense. In addition, the defendant maintains that since there was never a showing of how any permanent physical or mental impairment suffered by Ms. Smith "materially contributed to the defendant committing a criminal offense" or that Ms. Smith "did not know that she was giving money to the [d]efendant," the evidence adduced at trial is insufficient to support the determination of his guilt. The defendant further posits that language of the statute making criminal the offense of financial exploitation of a disabled person is ambiguous and must be construed in his favor (see *People ex rel. Gibson v. Cannon* (1976), 65 Ill. 2d 366, 370-71, 357 N.E.2d 1180) and, as a result, Ms. Smith was not proven to be a "disabled person" as that term is used in the statute.

The State, however, contends that defendant was proven guilty beyond a reasonable doubt where the statute defines a "disabled person" as one who, as a result of a permanent physical or mental impairment, is unable to avoid or prevent being financially exploited (see 720 ILCS 5/16—1.3(b)(2) (West 1992)) and the evidence showed that Ms. Smith, who suffered from post-poliosclerosis and was confined to a wheelchair, was deceived by defendant, her insurance agent, into giving him $14,000 which he never returned. The State further maintains that it was the State's burden to show neither that Ms. Smith's medical condition "materially contributed" to defendant's commission of the offense nor that Ms. Smith "did not know that she was giving money to the [d]efendant," but rather that, pursuant to the statute, the State's burden was to prove beyond a reasonable doubt that defendant, standing in a position of trust and confidence with a disabled person, gains control, by deception, over the disabled person's property (see 720 ILCS 5/16—1.3(a) (West 1992)). The State

posits that the evidence presented at trial demonstrates that (1) Ms. Smith suffered from post-poliosclerosis, which left her unemployed and dependent on defendant's financial advice; (2) defendant stood in a position of trust and confidence as Ms. Smith's insurance agent; (3) defendant deceived Smith into giving him $14,000, misleading her to believe that she was investing the money with defendant's employer; and (4) defendant kept that money for his personal use and never returned it and, as a result, the defendant was proven guilty beyond a reasonable doubt of financial exploitation of a disabled person.

We hold that Ms. Smith is a "disabled person" as that term is defined by the statute and that the trial court correctly determined that the evidence was sufficient to find the defendant guilty of financial exploitation of a disabled person. When the sufficiency of the evidence is challenged on appeal, the reasonable doubt test set forth by our supreme court in *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, is to be applied in all criminal cases whether the evidence is direct or circumstantial. (See *People v. Berry* (1990), 198 Ill. App. 3d 24, 28, 555 N.E.2d 434.) That test is as follows:

" 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Collins*, 106 Ill. 2d at 261, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.

The statute that criminalizes the financial exploitation of a disabled person provides, in pertinent part:

"A person commits the offense of financial exploitation of [a disabled person] when he stands in a position of trust and confidence with the *** disabled person and he knowingly and by deception or intimidation obtains control over the *** disabled person's property with the intent to permanently deprive the *** disabled person of the use, benefit, or possession of his property." (720 ILCS 5/16—1.3(a) (West 1992).)

The statute further defines the term "disabled person" as follows:

" 'Disabled person' means a person who suffers from a *permanent* physical or mental impairment resulting from disease, injury, functional disorder or congenital condition which *renders such person incapable of avoiding or preventing the commission of the offense.*" (Emphasis added.) 720 ILCS 5/16—1.3(b)(2) (West 1992).

It is well established that where the language used in a statute is clear and unambiguous, the function of this court is to enforce the statute as enacted. (See *Cannon*, 65 Ill. 2d at 369.) The rationale behind this rule is that, in interpreting a statute, the true intent and meaning of the legislature must be given effect and the language

312

used in a statute is the primary source of legislative intent. (See *Cannon*, 65 Ill. 2d at 369.) We conclude that the language used in the statute is clear and unambiguous.

First, we hold that financially exploiting a "disabled person," as that term is understood by the statute, is the proscribed conduct. Next, we observe that the language of section 16—1.3(b)(2) defines a "disabled person" as one "who suffers from a permanent physical or mental impairment" that results from "disease, injury, functional disorder or congenital condition" and, as a result, the person's permanent impairment "renders such person incapable of avoiding or preventing the commission of the offense." (720 ILCS 5/16—1.3(b)(2).) "Incapable" is synonymous with "unable." (Roget's 21st Century Thesaurus 457 (1992).) As such, we hold that a "disabled person" under the statute is one who (1) suffers from a permanent physical or mental impairment, and (2) because of the impairment is unable to avoid or prevent being financially exploited by a person who stands in a position of trust and confidence.

■ Ms. Smith testified that she is disabled and that the source of her disability is a condition known as post-poliosclerosis.[1] She also testified that she relied upon social security disability checks as the source of her income. Moreover, the record indicates that she appeared in court in a motorized scooter to aid her because of her disability. The trial court could consider her testimony about her disability and observe her confinement in a motorized scooter and objectively find that Ms. Smith suffers from a permanent physical impairment. We hold in the case *sub judice* that this unrebutted evidence is sufficient to satisfy the State's burden of proving that the victim is a "disabled person" within the scope and meaning of the statute.

We also conclude that the other aspect of the State's burden with regard to proving that Ms. Smith was a "disabled person" within the

---

[1]Webster's Third New International Dictionary defines "polio" (also known as poliomyelitis) as "an acute infectious virus disease *** that is characterized by fever, motor paralysis, and atrophy of skeletal muscles often with permanent disability and deformity and that results from inflammation and degeneration of the nerve cells in the anterior horns of the gray substance of the spinal cord—." (Webster's Third New International Dictionary 1754 (1986).) "Sclerosis" is defined as "1 a: pathological hardening of tissue produced by overgrowth of fibrous tissue and other changes (as in arteriosclerosis) or by increase in interstitial tissue and other changes (as in multiple sclerosis)" or "b: any of various diseases characterized by sclerosis— usu[ally] used in combination." Webster's Third New International Dictionary 2034 (1986).

ambit of the statute was met; namely, that *because of* Ms. Smith's permanent impairment she was incapable of avoiding or preventing the defendant from financially taking advantage of her. The nature of the relationship between the defendant and Ms. Smith combined with her debilitated physical condition created a situation wherein Ms. Smith was in a position of vulnerability relative to the defendant and, as a result, was easy prey for the financial exploitation which occurred. As previously mentioned, the language of the statute provides that in order to commit the offense of financial exploitation of a disabled person, a defendant must "stand[ ] in a position of trust and confidence with the *** disabled person." (720 ILCS 5/16—1.3(a) (West 1992).) From this language, we conclude that this statute is only intended to apply to individuals who are in a position of trust relative to the victim, *i.e.*, a fiduciary relationship. Moreover, we understand the significance of the additional language stating that in order for the victim to be a "disabled person," the victim's permanent impairment must "render[ ] such person incapable of avoiding or preventing the commission of the offense" to connote that a defendant's guilt will be established as to this requirement when, in addition to a fiduciary relationship between the defendant and the victim, a situation exists wherein because of a victim's impairment, she is unable to avoid or prevent the commission of the offense due to undue influence.

■ In the present case, the defendant was Ms. Smith's insurance agent for five years. He testified that he came to know her by a friend of hers who referred him to her. He also testified that he had established a good personal relationship with Ms. Smith and that, prior to March 1991, he had conversations with her on many occasions relative to her financial situation and had counseled her with recommendations of how to accumulate enough money investments so that by the time that she reached 55 years of age she could draw a portion as income. Ms. Smith had a preexisting life insurance policy with Prudential and it is undisputed that the current source of her income consists of social security disability checks as a result of her post-poliosclerosis medical condition. When Ms. Smith received $14,000, which she testified was a large sum of money to her, she sought financial advice from the defendant, her insurance agent and investment counselor. Because of her physical disability and the position of confidence and trust which the defendant occupied with her, it is clear that Ms. Smith was unable to avoid financial exploitation by the defendant. As a result, the trial court correctly determined that Ms. Smith was a "disabled person" as that term is used by the statute and that the evidence was sufficient to find the defendant guilty of financial exploitation in the present case.

## II

Next, the defendant contends that the statute at issue in the present case is unconstitutionally vague because it fails to give adequate notice as to what conduct will subject a defendant to criminal penalties. He argues that the previously mentioned definition of a "disabled person" is ambiguous and susceptible of a variety of meanings and, as a result, it lacks the precision and exactness constitutionally required of a criminal statute (see *People v. Pembrock* (1976), 62 Ill. 2d 317, 322-23, 342 N.E.2d 28; *People v. Palkes* (1972), 52 Ill. 2d 472, 475-76, 288 N.E.2d 469). The defendant posits that since a defendant could not possibly know "what maladies or illnesses a victim suffers from and the permanency of those afflictions," the statute fails to give adequate notice of what conduct is proscribed because a defendant might not know that a victim suffers from a permanent impairment.

The State, however, contends that the statute at issue is sufficiently definite to withstand a vagueness challenge. The State maintains that where, as in the present case, a penal statute does not involve first amendment rights, a defendant may only challenge the constitutionality of the statute as it was applied to him (see *People v. Jihan* (1989), 127 Ill. 2d 379, 386, 537 N.E.2d 751) and, as a result, the defendant in the present case can only argue that the statute's language is unconstitutionally vague as it was applied to him. The State posits that, upon a reading of the previously mentioned statutory language, the words used therein are sufficiently definite to describe, as being criminally prohibited, the acts that the defendant was charged and found guilty of having performed.

Before addressing this issue, we note, and the State correctly points out in its brief, that even though the defendant did not raise and the trial court did not address a constitutional challenge to the statute, such a challenge can be raised at any time. See *People v. Bryant* (1989), 128 Ill. 2d 448, 454, 539 N.E.2d 1221.

■ Initially, we must address the question of the defendant's standing. It is true that due process requires that the proscriptions of a criminal statute be clearly defined when measured by common understanding and practices so that it provides a sufficiently definite warning as to what conduct is proscribed. (See *People v. Fabing* (1991), 143 Ill. 2d 48, 53, 570 N.E.2d 329; *Jihan*, 127 Ill. 2d at 385.) However, the right to challenge a statute as being unconstitutionally vague on its face where the statute clearly applies to the conduct of the party making the challenge does not exist unless first amendment freedoms are involved. (See *Jihan*, 127 Ill. 2d at 386.) In the present case, no first amendment issue is involved and, as a result, the defendant does

not have standing to argue that the statute is unconstitutionally vague on its face. (See *Jihan*, 127 Ill. 2d at 386.) However, the defendant clearly has standing to raise the issue of whether the statute's language was vague as applied to him.

To prevail in a vagueness challenge to a statute that does not implicate first amendment concerns, a party must demonstrate that the statute was vague as applied to the conduct for which he was prosecuted. (See *Jihan*, 127 Ill. 2d at 385.) That is, the challenger must demonstrate that the statutory language did not provide clear notice that his conduct was prohibited. See *Jihan*, 127 Ill. 2d at 385.

■ We conclude that there is no merit to the defendant's contention that the statutory language at issue is unconstitutional as applied to the conduct for which he was prosecuted. Despite the defendant's contention that the statutory language at issue is unconstitutionally vague because a defendant such as he might not know "what maladies or illnesses a victim suffers from," a defendant's knowledge or lack thereof of the victim's medical condition is irrelevant to whether he is guilty of committing the offense. The legislature specifically provided that "[i]t shall not be a defense to financial exploitation of a[ ] *** disabled person that the accused reasonably believed that the victim was not a[ ] *** disabled person." (720 ILCS 5/16—1.3(f) (West 1992).) As such, it is obvious that a defendant's knowledge or lack thereof about a victim's medical condition is immaterial to whether he commits the offense of financial exploitation of a disabled person.

Despite the defendant's contention in this respect, in the present case, we can infer that he was put on notice of Ms. Smith's condition. He knew that she had a disability which required the use of a wheelchair and that, at age 41, her income consisted of social security disability checks. He testified that he had developed a close personal relationship with her over a course of five years and did not offer any evidence to rebut the fact that Ms. Smith suffered from post-poliosclerosis. Accordingly, he may not now claim that he was not put on notice of the victim's physical disability.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

McNULTY, J., concurs.

PRESIDING JUSTICE MURRAY, dissenting:
I agree with the majority that the statute is constitutional, but

respectfully disagree with the majority's conclusion that the State proved Ms. Smith was a disabled person as defined by the statute. The statute defines "disabled person" as

> "a person who suffers from a permanent physical or mental impairment resulting from disease, injury, functional disorder or congenital condition which renders such person incapable of avoiding or preventing the commission of the offense." (720 ILCS 5/16—1.3(b)(2) (West 1992).)

There is absolutely no evidence that Ms. Smith was "suffering from a disease, *etc.*, which rendered her incapable of avoiding or preventing the commission of the offense." That is a prerequisite of the crime.

Ms. Smith testified she was disabled by a condition she described as "post-poliosclerosis." Nothing in the disease of poliomyelitis suggest that a person so affected is unable to avoid or prevent the offense of "financial exploitation" as required by the statute. Further, Ms. Smith's condition was "post-poliosclerosis." "Post," when used in that sense, means "following after," "subsequent to." (Webster's Third New International Dictionary 1771 (1986).) In other words, Ms. Smith was suffering from a condition subsequent to her disease. Nothing in the record suggests Ms. Smith was left, after her disease, "with the inability to avoid or prevent the commission of the offense" as defined by the criminal statute.

If the legislature wanted to subject insurance agents who take advantage of disabled persons, regardless of the nature of their disability, they could have said so. It is to be noted that the crime of "financial exploitation" is also extended to the elderly. Yet, "elderly" means only those who are over 60 years old and also suffering from a disease or infirmity associated with advanced age and manifested by physical, mental or emotional dysfunctioning to the extent that such person is incapable of avoiding the commission of the offense.

Under the majority opinion any "disabled person" or elderly person is protected by the statute. Yet, that is not what the legislature said or apparently meant.

In this connection, it should be observed that the applicable statute provides that its provisions do not limit the remedies available to a victim under the Illinois Domestic Violence Act of 1986 (Ill. Rev. Stat. 1991, ch. 40, par. 2311—1 *et seq.*). Yet, that act defines an adult with disabilities as including one who "has never been adjudicated an incompetent." (Ill. Rev. Stat. 1991, ch. 40, par. 2311—3(2).) The effect of the majority's opinion is to treat adults as adults with a disability identical when exploited, even though the two acts contain a different definition as to the disability suffered by the adult.

The effect of the majority opinion is to create a new crime

applicable to adults who are disabled regardless of the nature of the disability. Creation of a crime is for the legislative branch of government, not the judiciary.

I would reverse on the sole basis that the State failed to prove an essential element of the crime to wit: that the victim was disabled as that term is defined in the act creating the crime of "financial exploitation of an elderly or disabled person."